UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEARBORN STREET BUILDING
ASSOCIATES LLC,

        Plaintiff,

vs.

D & T LAND HOLDINGS, LLC;
PCI HOLDINGS, LLC; and,
THE HUNTINGTON NATIONAL
BANK,

        Defendants.

_____/

Case No. 1:07-cv-1056

Hon. Hugh W. Brenneman, Jr.

**OPINION**

        Plaintiff, Dearborn Street Building Associates LLC ("Dearborn") brought this

diversity action against D&T Holdings, LLC ("D&T"), PCI Holdings, LLC ("PCI") and the

Huntington National Bank, alleging two counts for violations of the Michigan Uniform Fraudulent

Transfer Act, M.C.L. § 566.31 *et seq.* ("MUFTA") and one count seeking garnishment of a state

court judgment. The court dismissed plaintiff's garnishment count for lack of jurisdiction and also

dismissed The Huntington National Bank ("Huntington Bank") as a defendant in this action. *See*

docket nos. 30 and 49. The parties consented to have this matter tried by the undersigned pursuant

to 28 U.S.C. § 636(c) and Fed. Rules Civ. Proc. 73. Following a one-day bench trial, post-trial

briefs were submitted. The case is ready for decision.

## Findings of Fact

Based upon the testimony and exhibits received at trial, the facts stipulated by the parties, and the record in this proceeding, the court makes the following findings of fact as required under Fed. R. Civ. Proc. 52(a)[1]:

1.      Brent A. Tate ("Tate") formed PCI in 1998 for the purpose of holding real estate. Trial Trans. at 46.[2] At that time, Tate owned 75% of PCI and Fred Russo owned 25%. *Id.* at 47. Tate became 100% owner of PCI in or about 2000. *Id.* at 48. In 2002, Brian Lamoreaux ("Lamoreaux") became a 50% member of PCI, with Tate owning the other 50%. *Id.* at 48.

2.      In 2004, PCI purchased certain real property with the addresses of 4442, 4444 and 4462 Remembrance Road, N.W., Walker, Michigan (the "Remembrance Road property") for approximately $660,000.00. *Id.* at 9-10, 19-20, 48-49; PE 5, 6, 7, 8, 9, 10, 11.[3] The Remembrance Road property consists of approximately 3.2 acres and includes a 10,635 square foot building. Trial Trans. at 19, 48, 70. PCI leased the Remembrance Road property to Premier Caulking, Inc., a masonry concrete restoration company owned solely by Tate. *Id.* at 48-49. Premier Caulking, Inc., has been the only tenant of the Remembrance Road property since PCI purchased the property. *Id.* at 49.

---

[1] Any findings of fact which contain conclusions of law shall be considered as such. The citations to the record below are representative and not intended to be an exhaustive recounting of all evidence in the record supporting a particular finding.

[2] Brent A. Tate was the only live witness in this matter. His testimony is set forth in the trial transcript (docket no. 65).

[3] Plaintiff's Exhibits will be designated as "PE #" and defendants' exhibits will be designated as "DE #."

3. In 2005, Tate was having difficulties with Lamoureaux and suggested that PCI sell the property. *Id.* at 50.

4. Sometime in 2006, Tate and Lamoreaux met with Grooters, a local development company. *Id.* at 50-51. Grooters advised Tate and Lamoreaux that they would be "lucky" to get $750,000.00 for the property. *Id.* PCI did not list the property for sale at that time. *Id.*

5. In December 2006, Premier Caulking, Inc. gave notice to PCI that it intended to terminate its lease on the Remembrance Road property. *Id.* at 51. At that time, Tate was the sole owner of Premier Caulking, Inc., and Tate and Lamoreaux were the sole owners of PCI. Tate's primary goal in terminating the lease on behalf of Premier Caulking, Inc., was to break ties with Lamoreaux. *Id.*

6. On January 16, 2007, PCI entered an agreement to sell the Remembrance Road property to Premier Caulking, Inc. for a purchase price of $950,000.00. PE 1.

7. On January 19, 2007, Dearborn obtained a judgment from the Circuit Court of Cook County, Illinois against PCI, following a contested proceeding, in the amount of $500,000.00 plus pre-judgment interest from April 1, 2005 at the rate of 5% (the "Illinois judgment"). Stipulated Facts ¶ A;[4] DE E.

8. On April 10, 2007, Dearborn filed an Affidavit and Notice of Entry of Foreign Judgment with the Muskegon County Circuit Court. Stipulated Facts at ¶ B; DE E. At that time, PCI's business address and resident agent were located in Muskegon County. PE 6; DE E.

---

[4] The parties' joint proposed final pretrial order listed eight "uncontroverted facts" identified in paragraph 2, subparagraphs A through I. *See* docket no. 44. The court will refer to these as "Stipulated Facts at ¶ [letter]."

9.      On April 20, 2007, Tate formed D&T, which he controlled.  Stipulated Facts at ¶¶ D, E, H.

10.     D&T applied to the Huntington Bank for a loan to purchase the Remembrance Road property, with Premier Caulking, Inc. as a corporate guarantor of the purchase.  Trial Trans. at 31-35.  The Huntington Bank had the Remembrance Road property appraised at a value of $890,000.00.  *Id.* at 34-35, 45.

11.     In May 2007, the Remembrance Road property was the only asset of PCI, and it was encumbered with a $650,000.00 mortgage in favor of the Huntington Bank.  *Id.* at 20.

12.     In an "Addendum to Purchase Agreement" dated May 2, 2007, Premier Caulking, Inc., assigned its right to purchase the Remembrance Road property to D&T.  PE 5; Trial Trans. at 33.  Pursuant to the Addendum, D&T agreed to purchase the Remembrance Road property for a "sale price" of $890,000.00.  PE 5; Trial Trans. at 33, 35. The Addendum was executed: by Tate in his capacity as president of the assignor, Premier Caulking, Inc.; by Tate and Lamoreaux as members of the seller, PCI; by Tate as the member of assignee and purchaser, D&T; and by Denise Hazelrigg of LandAmerica Transnation, the title company that closed the transaction, disbursed funds and issued title insurance.  PE 5, 9, 10, 11.

13.     On May 2, 2007, D&T purchased the Remembrance Road property. Stipulated Fact ¶ F.  The sale of this property was memorialized by several documents, including: a "Seller's Statement;" a "Purchaser's Statement;" a warranty deed; a Michigan Department of Treasury Real Estate Transfer Tax Valuation Affidavit; and a Michigan Department of Treasury Property Transfer Affidavit.  PE 6, 7, 8, 9 and 10.

14.     The Seller's Statement, which was signed by Tate and Lamoreaux on behalf of PCI, and Hazelrigg on behalf of LandAmerica Transnation, set forth a sale price of $890,000.00. PE 9. The sale price included the following deductions to be paid by PCI: county transfer tax ($979.00); state transfer tax ($6,675.00); closing fee paid to LandAmerica Transnation ($200.00); 2006 winter taxes to Kent County ($760.62); sewer assessment to the city of Grand Rapids ($19,606.65); a calendar year tax proration from January 1, 2007 through May 2, 2007 ($2,999.10); principal and interest through May 2, 2007 due to the Huntington Bank ($649,439.30); and a "promissory note" ($155,143.64). *Id.* The charges and deductions totaled $835,803.31, with a "net amount due" to the seller, PCI, of $54,196.96. *Id.*

15.     The Purchaser's Statement, which was signed by Tate on behalf of D&T, and Hazelrigg on behalf of LandAmerica Transnation, also set forth a sale price (i.e. a "purchase price") of $890,000.00. PE 10. The sale price included the following additional charges to be paid by D&T: loan charges to the Huntington National Bank ($1,918.50); tax certificate to Kent County Treasurer ($1.00); recording fees to Kent County Register of Deeds ($96.00); Title Insurance to LandAmerica Transnation ($1,523.00); closing fee, recording processing fee, and escrow holding fee owed to LandAmerica Transnation ($370.00); and "completion of Phase II (Rose & Westra)" ($14,234.24). *Id.* The money designated for "Phase II" referred to environmental work performed on the property by environmental consultants. Trial Trans. at 70-71. With these additional charges, D&T had a "gross amount due" to PCI of $908,142.74. PE 10. The Purchaser's Statement also listed $908,142.74 of credits to D&T as follows: calendar year tax proration from January 1, 2007 through May 2, 2007 ($2,999.10); a "promissory note" ($155,143,64); and the "loan amount from The

Huntington National Bank" ($750,000.00).  *Id.*  With these credits, the purchaser, D&T had a "$0.00" balance due to PCI at the closing.  *Id.*

16.     The Real Estate Transfer Tax Valuation Affidavit stated that the sale of the Remembrance Road property from PCI to D&T was for a total consideration of $890,000.00, which consisted of a cash payment of that amount.  PE 7.  The $890,000.00 consideration resulted in a county tax of $979.00 and a state tax of $6,675.00.  *Id.*

17.     The Property Transfer Affidavit stated that the purchase price of the Remembrance Road property was $890,000.00.  PE 8.

18.     The closing agent's "Receipts and Disbursements Ledger" for the real estate transaction listed the receipt of a loan check from the Huntington National Bank in the amount of $750,000.00.  PE 11.  From this loan, the closing agent disbursed eight checks as follows:

| Check No. | Payee | Amount |
|---|---|---|
| No. 205842 | Kent County Treasurer | $ 1.00 |
| No. 205843 | Grand Rapids City Treasurer | $ 19,606.65 |
| No. 205844 | Kent County Treasurer | $ 760.62 |
| No. 205845 | LandAmerica Transnation | $ 2,093.00 |
| No. 205846 | Kent County Register of Deeds | $ 7,750.00 |
| No. 205847 | Huntington Bank | $649,439.30 |
| No. 205848 | The Huntington National Bank | $ 1,918.50 |
| No. 205849 | PCI Holdings, LLC | $ 54,196.69 |

*Id.*  A check in the amount of $14,234.24 for "completion of Phase II" was not issued.  *Id.*

19.     On May 2, 2007, Tate and Lamoreaux signed a warranty deed on behalf of PCI, conveying the Remembrance Road property to D&T for the consideration of $890,000.00 as stated in the Real Estate Transfer Valuation affidavit attached to the deed.  PE 6.

20.     Tate was aware that the Huntington National Bank agreed to lend money to D&T on the basis that the Remembrance Road property had an appraised value and purchase price of $890,000.00.  Trial Trans. at 34-35, 45.

21.     D&T never issued a promissory note in favor of PCI.  Stipulated Fact ¶ G.

22.     PCI was insolvent when it sold the Remembrance Road property to D&T. Answer to First Amended Compl.  at ¶ 23 (docket no. 7).

23.     At the time of the sale, Tate, "as a member of PCI," had no knowledge of the Illinois Judgment against PCI.  Trial Trans. at  62-63.

24.     The Affidavit and Notice of Entry of the Illinois Judgment was mailed to PCI's resident agent on May 3, 2007.  DE E.

25.     Sometime after the closing, Lamoreaux wrote himself a check from PCI in the amount of $ 54,000.00.  Trial Trans. at 61-62.

## Conclusions of Law

For the reasons stated below, the court concludes that plaintiff is entitled to relief under MUFTA.[5]

### I.     Jurisdiction

---

[5] The court notes that Michigan adopted MUFTA in 1998 to replace the Uniform Fraudulent Conveyance Act ("UFCA").  *In re Michigan Machine Tool Control Corp.*, 381 B.R. at 667.  MUFTA did not fundamentally alter the nature of fraudulent transfers from the prior UFCA.  *Id.*  "Thus, Michigan case law interpreting the prior act is still viable."  *Id. citing In re Hurtado*, 342 F.3d 528, 532 fn. 1 (6th Cir. 2003) and *In re Harlin*, 321 B.R. 836 (Bankr. E.D. Mich. 2005).  Accordingly, the court will cite Michigan case law decided under the now-repealed UFCA when applicable.

This court has jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

## II.  Count I (actual intent to defraud)

## A.  Legal standard

In Count I, Dearborn alleged that the sale of property by PCI to D&T "was made with actual intent to hinder, delay or defraud creditors of PCI, specifically Dearborn" contrary to M.C.L. § 566.34(1)(a), which provides in pertinent part as follows:

> (1) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . .
>
> > (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

A claim brought pursuant to § 566.34(1)(a) refers to actual fraud in the transfer of the asset. *See In re Michigan Machine Tool Control Corp.*, 381 B.R. 657, 667 (Bankr. E. D. Mich. 2008). Under MUFTA, intentional fraud must be established by clear and convincing evidence. *Al-Naimi v. Foodland Distributor, Inc.*, No. 285375, 2009 WL 1564956 at *1 (Mich. App. June 2, 2009). "Clear and convincing evidence is evidence that 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re Chmura*, 464 Mich. 58, 72, 626 N.W.2d 876 (2001), quoting *In re Martin*, 450 Mich. 204, 227, 538 N.W.2d 399 (1995). In determining whether a party has met the clear and convincing standard, the Michigan Supreme Court has observed that "[e]vidence may be uncontroverted, and yet not be clear and convincing," while, conversely,

"evidence may be clear and convincing despite the fact that it has been contradicted." *In re Martin*, 450 Mich. at 227.

In the case of a fraudulent transfer or conveyance, "[t]he fraudulent intent that must be proved is that of the transferor, not the transferee." *Al-Naimi*, 2009 WL 1564956 at *1, citing *In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 500 (W.D.. Mich. 1993); *In re Otis & Edwards, P.C.*, 115 B.R. 900, 913 (E.D. Mich. 1990). Under Michigan law, actual intent to defraud may be inferred from the "badges of fraud" listed in § 566.34(2). *Szkrybalo v. Szkrybalo*, 2007 WL 1575262 at *2 (Mich. App. May 31, 2007), *citing Coleman-Nichols v. Tixon Corp.*, 203 Mich. App. 645, 659-60, 513 N.W.2d 441 (1994) (applying test under UFCA and noting that "[t]hese badges of fraud are not conclusive evidence, but may be strong or weak depending upon their nature and number occurring in the same case").

The badges of fraud are enumerated as follows:

(2) In determining actual intent under subsection (1)(a), consideration may be given, among other factors, to whether 1 or more of the following occurred:

(a) The transfer . . . was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer . . was disclosed or concealed.

(d) Before the transfer was made . . ., the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) [whether] [t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . .

(i) The debtor was insolvent or became insolvent shortly after the transfer was made . . .

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

§ 566.34(2).  The badges of fraud specifically enumerated in § 566.34(2) are not exclusive.  *Al-Naimi*,  2009 WL 1564956 at *1.

### B.    The badges of fraud present in the PCI transfer

The court finds six badges of fraud present in this case.  First, plaintiff has demonstrated by clear and convincing evidence that "[b]efore the transfer was made . . ., the debtor [PCI] had been sued or threatened with suit." M.C.L. § 566.34(2)(d).  It is undisputed that Dearborn filed suit and secured a judgment against debtor and transferor PCI prior to the transfer.

Second, plaintiff has demonstrated by clear and convincing evidence that "[t]he transfer was of substantially all of the debtor's [PCI's] assets."  M.C.L. § 566.34(2)(e).  It is undisputed that PCI was insolvent.  In May 2007, the Remembrance Road property was the only asset of PCI, and it was encumbered with a $650,000.00 mortgage in favor of the Huntington Bank.  Trial Trans. at 20.

Third,  the court must consider whether "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . ."  M.C.L. § 566.34(h). Plaintiff has demonstrated by clear and convincing evidence that the value of the consideration paid to PCI was not "reasonably equivalent" to the value of the  real estate transferred to D&T.

10

MUFTA does not define the term "reasonably equivalent value." *See Zervos Group, Inc. v. Thompson Asphalt Products, Inc.*, No.265397, 2006 WL 1156369 at *9 (Mich. App. May 2, 2006). However, Michigan courts look to the Bankruptcy Code and decisions from other courts applying the Uniform Fraudulent Transfer Act ("UFTA")[6] for guidance in determining whether a particular transaction involved "reasonably equivalent value":

> The phrase "reasonably equivalent value," which was derived from § 548 of the federal Bankruptcy Code, 11 USC 548, has also been construed to include indirect benefits to the debtor from the transfer. *See In re Auto Specialties Mfg. Co.*, 153 BR 457, 498 (WD Mich, 1993); *see also In re Image Worldwide, Ltd.*, 139 F3d 574, 579 (CA 7, 1998) ("indirect benefits may be considered as part of the inquiry into reasonably equivalent value in a transaction"). Thus, to decide whether a debtor received "reasonably equivalent value" for an allegedly fraudulent transfer, all aspects of the subject transaction must be examined in order to determine the value of the benefits and burdens to the debtor, both direct and indirect. *See In re Suburban Motor Freight, Inc.*, 124 BR 984, 997 (SD Ohio, 1990); *see also Silverberg v. Colantuno*, 991 P.2d 280, 287 (Colo App, 1998) (the determination whether "reasonably equivalent value" was received in exchange for a transfer depends upon an analysis of all the facts and circumstances of each case).

*Zervos Group, Inc.*, 2006 WL 1156369 at *9.

In determining "reasonably equivalent value," courts "generally consider many factors, including the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *In re Dealers Agency Services, Inc.*, 380 B.R. 608, 619 (Bkrtcy. M.D. Fla. 2007) (internal quotation marks omitted). The essential examination in determining "reasonable equivalence" is comparing the value of what went out with the value of what was received. *See id.*; *In re Leneve*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006); *In re Grabill Corp.*, 121 B.R. 983, 994 (Bankr. N.D. Ill.1990).

---

[6] *See SCD Chemical Distributors, Inc. v. Medley*, 203 Mich. App. 374, 378, 512 N.W.2d 86 (1994) ("this Court has observed that we may look to decisions from other states for guidance when interpreting uniform acts").

According to the commentary to the Uniform Fraudulent Transfer Act ("UFTA"), "value is to be determined in light of the act's purpose, in order to protect the creditors." *In re Agric. Res. & Tech. Group, Inc.*, 916 F.2d 528, 540 (9th Cir.1990). "Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." Unif. Fraudulent Transfer Act § 3 cmt. 2. (1984).

*S.E.C. v. Resource Development Intern., LLC*, 487 F.3d 295, 301 (5th Cir. 2007). *See generally*, *Dunn v. Minnema*, 323 Mich. 687, 693, 36 N.W.2d 182 (1949) (observing that "what constitutes a 'fair equivalent' or 'a fair consideration'" under the UFCA "must be determined from the standpoint of creditors . . . [i]n general the test would seem to be whether the 'conveyance' by the debtor . . . renders the debtor execution proof"); *McCaslin v. Schouten*, 294 Mich. 180, 186, 292 N.W.696 (1940) (in a case under the UFCA, court observed that while a debtor "might be satisfied to give his assets to a stranger or to exchange them for some worthless chattel . . . the law will not permit him to do so if he thereby renders himself uncollectible to the detriment of his creditors").

Given these considerations, PCI did not receive reasonably equivalent value for the Remembrance Road property. The January 16, 2007 buy and sell agreement (as modified by the May 2, 2007 addendum) and all of the closing documents clearly establish that the purchase price for the Remembrance Road property was $890,000.00. The court rejects Tate's testimony to the extent that he claims the purchase price was less than that amount. While Tate denied knowledge of the January 16, 2007 buy and sell agreement between Premier Caulking, Inc. and PCI, he nevertheless later signed an addendum to that agreement in which Premier Caulking, Inc. assigned its rights under the purchase agreement to D&T, with a revised the sale price of $890,000.00. PE 5; Trial Trans. at 33. Tate signed this addendum as a representative of *all* of the parties to the transaction, i.e., the assignor (Premier Caulking, Inc., of which Tate owned 100%), the assignee (D&T), the seller (PCI) and the purchaser (D&T). PE 5. Tate admitted that the Huntington Bank loaned D&T the money

to purchase the Remembrance Road property based upon an appraisal and purchase price of $890,000.00.  Trial Trans. 33-34, 45.

Notably, Tate certified to the taxing authorities in two affidavits that the Remembrance Road property was valued at, and sold for, $890,000.00.  Both of these affidavits are required by state statutes.  The Real Estate Transfer Tax Valuation Affidavit was executed pursuant to P.A. 134 of 1966,  which provides in pertinent part that "[a] written instrument subject to the [real estate transfer tax] imposed by this act shall state on its face the total value of the real property or there shall be attached to the instrument an affidavit *declaring the total value of the real property*."  *See* M.C.L. § 207.504 (emphasis added); PE 6, 7.  Similarly, the Property Transfer Affidavit was executed pursuant to P.A. 415 of 1994, which provides in pertinent part that "the buyer, grantee, or other transferee of the property shall notify the appropriate assessing office in the local unit of government in which the property is located of the transfer of ownership of the property within 45 days of the transfer of ownership, on a form prescribed by the state tax commission that states the parties to the transfer, the date of the transfer, *the actual consideration for the transfer*, and the property's parcel identification number or legal description."  M.C.L. § 211.27a(10) (emphasis added); PE 8.  Tate's testimony that the property was sold for less than $890,000.00 is contrary to all of the documentation memorializing the real estate transaction and, in the court's opinion, is not credible and certainly finds no support in the other evidence.  Accordingly, the court concludes that the Remembrance Road property was valued at $890,000.00 and sold to D&T for that amount.

Having established that the "value of the asset transferred" was $890,000.00, the court must now determine whether the "value of the consideration received by the debtor was reasonably equivalent" to that amount.  *See*  M.C.L. § 566.34(h).  PCI, which was insolvent at the time of the

closing, and subject to a $500,000.00 foreign judgment, received significant benefits from sale to D&T: PCI received funds to pay off a $649,439.30 mortgage owed to Huntington Bank and $54,196.69 of cash at the closing. In addition, PCI was supposed to receive a promissory note for the balance of the purchase price in the amount of $155,143.54. However, D&T never issued the promissory note.

Neither defendant has adequately explained why the $155,143.64 promissory note was not issued, even though it constituted approximately 17% of the purchase price, was referenced as an item in both the Seller's Statement and the Purchaser's Statement, and was used by both PCI and D&T to reconcile the funds which passed hands during the May 2, 2007 closing. When combined with the $750,000.00 mortgage loan and a $2,999.10 tax proration credit, this promissory note enabled D&T to pay the $890,000.00 purchase price and $18,142.74 of additional charges related to the closing, without having to bring any cash to the closing. Moreover, while the $155,143.64 promissory note is listed on the Purchaser's Statement as part of the purchase price to be tendered by D&T, the promissory note is *not* represented on the Seller's Statement as part of the purchase price. Rather, the Seller's Statement treats the promissory note, without explanation, as a charge taken *against the seller*, similar to PCI's payoff of the outstanding Huntington Bank Mortgage. Based upon the closing documents, PCI should have received $54,196.69 in cash and a promissory note from D&T in the amount of $155,143.64, which together represented PCI's $209,340.33 equity in the property. However, PCI left the closing with only the cash (in the form of a check), with the promissory note having been removed from the transaction (as if PCI had forgiven the debt).

Despite the documentation, Tate testified that: the promissory note was not owed to PCI (trial trans. at 44-45); D&T's total payment due to PCI was only $750,000.00 (trial trans. at 55); he agreed to pay only $750,000.00 for the property (trial trans. at 59); he agreed to pay $750,000.00 "plus the environmentals" for the property (trial trans. at 69);[7] and that both he and Huntington Bank objected to the promissory note (trial trans. at 80-81). Tate explained that "the title lady did not want to type up the new paperwork a third time and Huntington Bank was secure in that" (trial trans. at 81) and that "[a]s long as that was the truth and there was no actual promissory note, Huntington was fine with the sale" (trial trans. at 81). Tate further testified that he signed the documentation because he "wanted to get out of there" and "to separate my ways and move on from Brian Lamoreaux." Trial Trans. at 81. If Tate's testimony is to be believed, he must have lied on affidavits furnished to the state regarding the consideration paid for the property, misrepresented the structure of the real estate transaction on the closing documents, and had an arrangement with a secured creditor of both PCI and D&T (i.e., the Huntington Bank) which was different from the financing arrangement as reflected

---

[7] Tate testified that the "environmentals" included the cost of the environmental consultants ($14,234.24) and environmental improvements (e.g., placing Chemco resistant coating on the warehouse floors, removal of top soil, constructing a fence and landscaping) which exceeded $50,000.00. Trial Trans. at 70-75. While Tate testified that this work had to be performed within 42 days of the closing, he provided no documentation regarding the environmental requirement or the exact amount expended on the environmental work. *Id.* at 70-74. Tate later testified that "the environmental improvements" were not part of the purchase agreement. *Id.* at 86. According to Tate, he received "information" from the Huntington Bank regarding "the environmental improvements." *Id.* Tate's latter testimony regarding the receipt of information from Huntington Bank is consistent with the January 19, 2007 buy and sell agreement, which included the following notation: "ENVIRONMENTAL COPY AT HUNT. BANK." PE 1. From this testimony and exhibit, the court can infer that the environmental work, which cost D&T over $64,000.00, was related to Huntington Bank's mortgage. In addition, the court notes a relationship between the purchase price and the cost of the environmental work: the original purchase price of the property ($950,000.00), when reduced by the cost of the environmental work undertaken by the purchaser D&T (approximately $64,234.24), is $885,765.76, an amount within a few thousand dollars of the purchase price of $890,000.00. While there is no direct evidence that the parties adjusted the purchase price based on the cost of the environmental work, the court finds it an interesting coincidence that the original purchase price was reduced by an amount which grossly approximated the cost of the environmental work paid by the purchaser after the closing.

in the closing documents. Defendants called no witnesses from Huntington Bank to corroborate Tate's testimony, nor was "the title lady" called to testify.

The court finds that Tate's explanation of the real estate transaction is neither realistic nor credible. The parties structured the sale of the property for $890,000.00, reported it to the state taxing authorities as such, and then manipulated the closing documents to remove the promissory note as a payment from D&T to PCI. While the removal of the promissory note from the transaction benefitted D&T, the lack of a promissory note prejudiced PCI's creditors. In summary, "what went out" from PCI was a piece of property worth $890,000.00, which was encumbered by a mortgage in the amount of $649,439.30, leaving PCI with an equity interest in the property of $240,560.70. After deducting PCI's taxes and closing costs of $31,220.37, PCI should have received a payment from D&T in the amount of $209,340.33. The closing documents reflected this transfer of funds as a cash payment in the amount of $54,196.96 and a promissory note in the amount of $155,143.64. Contrary to the documentation, "what was received" by PCI was only the cash payment of $54,196.96. Under these circumstances, plaintiff has shown by clear and convincing evidence that PCI did not receive reasonably equivalent value in exchange for the sale of the Remembrance Road property.

Fourth, the court must consider whether "[t]he debtor was insolvent or became insolvent shortly after the transfer was made . . ." M.C.L. § 566.34(i). It is undisputed that PCI was insolvent when it sold the Remembrance Road property to D&T.

Fifth, plaintiff has shown by clear and convincing evidence that "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred." § 566.34(j). Dearborn secured the Illinois Judgment on January 19, 2007. An affidavit of entry of that judgment was filed in the Muskegon County Circuit Court on April 10th. Tate formed D&T on April 20th, and this new

16

entity purchased the Remembrance Road property twelve days later. The transfer occurred less than four months after Dearborn obtained a $500,000.00 judgment against PCI (and less than one month after the judgment was registered in this state).

Finally, a sixth factor to be considered is the fact that the sale of the Remembrance Road property was not an arms length transaction. Rather, the sale was between two limited liability companies in which Tate owned an interest. One "badge of fraud" is whether the transfer was to an "insider." *See* M.C.L. § 566.34(2)(a). While MUFTA defines a number of individuals and entities as an "insider" for purposes of evaluating whether a debtor's transaction was at arm's length, *see* § 566.31(g), the statute does not explicitly define an insider with respect to relationships arising from limited liability companies such as PCI and D&T. Nevertheless, the transaction between PCI and D&T was tantamount to an "insider" deal under MUFTA. *See, e.g., General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1499 (11th Cir. 1997) (in construing under Florida's version of UFCA, court concluded that "[a] close relationship between a transferor debtor and a transferee is a factor equivalent to a badge of fraud which should be considered in determining fraudulent intent"); *Coleman-Nichols*, 203 Mich. App. at 659-60 (under the former statute (UFCA), "badges of fraud" included "a close relationship between transferor and transferee"). In this case, there was such a "close relationship" between the transferor and the transferee, because Tate was a member of both LLC's, owning 50% of the transferor and 100% of the transferee (as well as 100% of Premier Caulking which was initially going to purchase the property and subsequently assigned it rights under the purchase agreement to D&T). Tate personally benefitted from this transaction, which resulted in D&T, an LLC solely owned by Tate, replacing PCI, an LLC partially owned by

Tate, as the landlord for Premier Caulking, Inc., a corporation solely owned by Tate.[8]  It also freed him of his association with Lamoreaux, the other owner of PCI, which he sought.

Plaintiff has established the existence of  six badges of fraud by clear and convincing evidence.  Based upon this evidence, the court infers that PCI, as a legal entity,  had the actual intent to defraud its creditors by transferring the Remembrance Road property to D&T.  Accordingly, the court concludes that PCI's transfer to D&T was a fraudulent transfer in violation of § 566.34(1)(a).

### III.     Count II (constructive fraud)

### A.     Legal standard

In Count II, Dearborn alleges that "PCI did not receive reasonably-equivalent value in exchange for the sale by it to D&T of the Property," and that "PCI was insolvent at the time of the sale, or became insolvent as a result of the sale of the Property."  Amend. Compl. at ¶¶ 22-23..  Dearborn asks the court to enter a judgment "Determining the sale by PCI to D & T of the Property to have been a fraudulent transfer avoidable under the Michigan Uniform Fraudulent Transfer Act."  Amend. Compl., p. 5, ¶ A.

M.C.L. § 566.35(1) provides in pertinent part as follows:

A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . .

---

[8] Tate's central role in the transfer of the property is underscored by defendants, when they erroneously state in their supplemental closing argument that he is a defendant in this action, i.e., "[t]he case is being brought against a company - D & T and individual - Brent Tate who, the record conclusively demonstrates, had absolutely no knowledge of the plaintiff's lawsuit and claims brought in Illinois, or the liquidated damages judgment that was ultimately domesticated in the Muskegon County Circuit Court."  *See* docket no. 66. p. 9.

*See In re Michigan Machine Tool Control Corp.*, 381 B.R. at 670 (§ 566.35(1) "requires evidence that the debtor made a transfer without receiving a reasonably equivalent value in exchange for it, *and* that he was insolvent at the time, or rendered insolvent as a result of it").

A claim brought pursuant to § 566.35 is one sounding in constructive fraud. *See In re NM Holdings Co.*, LLC, 407 B.R. 232, 249, fn. 92 (Bankr. E.D. Mich. 2009); *Nash Finch Co. v, 2125 Vienna Corp.*, No. 07-10997, 2008 WL 786804 at *6 (E.D. Mich. March 19, 2008); 11 Mich. Civ. Jur., Fraudulent Conveyances § 5 ("Under the Uniform Fraudulent Transfer Act, no actual intent is required to render a transfer void as against creditors where: (1) a person is or will be rendered insolvent by making a conveyance or incurring an obligation without receiving the fair equivalent value in exchange for the transfer or obligation; or (2) a transfer was made without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction") (footnotes omitted). *See also, Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009) (characterizing Florida's version of this UFTA section as constructive fraud); *Douglas v. Hill*, 148 Wash. App. 760, 199 P.3d 493, 498 (2009) (characterizing Washington's version of this UFTA section as constructive fraud); *In re First Financial Associates, Inc.*, 371 B.R. 877, 901-02 (Bankr. N.D. Ind. 2007) (characterizing Indiana's version of this UFTA section as constructive fraud). Unlike a case involving actual fraud, which requires a plaintiff to prove his case by clear and convincing evidence, a fraudulent transfer action involving constructive fraud is established under the less demanding standard of a preponderance of the evidence. *See In re TML, Inc.*, 291 B.R. 400, 436-37 (Bankr. W. D. Mich. 2003) (discussing Michigan case law on constructive fraud claim brought under Michigan's now-repealed UFCA).

## B.    Discussion

To prevail on its claim of constructive fraud as alleged in Count II, Dearborn needs to demonstrate by the preponderance of the evidence: (1) that Dearborn's claim against PCI arose before PCI made the transfer to D&T;  (2) that PCI made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and, (3) that PCI was insolvent at the time of the transfer, or became insolvent as a result of the transfer.

Plaintiff has established all three of the elements of constructive fraud.[9]  With respect to the first element, it is undisputed that Dearborn's claim against PCI arose before the transfer to D&T.  Dearborn obtained a $500,000.00 judgment against PCI on January 19, 2007, nearly four months before PCI's sale to D&T.  With respect to the second element, the court previously concluded that PCI did not receive reasonably equivalent value for the property.  *See discussion* at § II.B., *supra*.  Finally, with respect to the third element, it is undisputed that PCI was insolvent at the time of the sale of the property, Answer to First Amended Compl. at ¶ 23, and after the sale.

Accordingly, the court concludes that PCI's transfer of the Remembrance Road property to D&T was a fraudulent transfer as to Dearborn, a judgment creditor, in violation of § 566.35(1).

## IV.    Remedy

When a conveyance is declared fraudulent under § 566.34, "it is fraudulent only as to the grantor's creditors."  *United States v. Noble*, No. 1:97-cv-1053, 1999 WL 810437 at *1 (W.D. Mich. Aug. 19, 1999).  "The transfer is not voided altogether, the transferee retains title to the

---

[9] The court notes that while the preponderance of the evidence standard applies to the constructive fraud claim, Dearborn has established its claim through clear and convincing evidence, for the reasons as stated in § II.B., *supra*.

property subject to the rights of the creditors." *Id.*, *citing Brownell Realty, Inc. v. Kelly*, 103 Mich. App. 690, 699-701, 303 N.W.2d 871 (1981). MUFTA provides for various alternative and potentially inconsistent remedies in an action for relief against a fraudulent transfer, *see* M.C.L. § 566.37. Plaintiff has sought several of these at various points.[10]

Based on the facts as they have played out in this case, the court concludes that the appropriate remedy is set forth in § 566.37(2), which provides that "If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds." The relief sought by plaintiff at trial was against the proceeds. Trial Trans. at 4-5.[11] PCI sold the Remembrance Road property for $890,000.00. The proceeds of the sale were to include a cash payment from D&T in the amount of $54,196.69 and a promissory note from D&T in the amount of $155,143.64. Plaintiff is entitled to levy execution on both the $54,196.69 payment paid to PCI at the closing and the $155,143.64 due to PCI from D&T.

---

[10] Also, in its proposed findings of fact and conclusions of law, plaintiff seeks relief pursuant to M.C.L. §§ 566.38(2) and (3). *See* docket no. 67 at ¶ 5. Section 566.38 does not set forth the remedies available to a prevailing plaintiff under MUFTA. The remedies for relief under MUFTA are set forth in M.C.L. § 566.37 (entitled "Action for relief against transfer or obligation; remedies; levy of execution on asset or proceeds). The remedies set forth in § 566.37 are limited by the applicable provisions of § 566.38 (i.e., "[i]n an action for relief against a transfer or obligation under the act, a creditor, subject to the limitations of section 8 [i.e., § 566.38], may obtain 1 or more of the following . . .").

[11] A creditor's authority to levy execution on the proceeds of an asset under § 566.37(2) also existed under UFCA. *See* Comment (5), UFTA § 7 ("[t]he provision in subsection (b) [codified by Michigan as § 566.37(2)] for a creditor to levy execution on a fraudulently transferred asset continues the availability of a remedy provided in § 9(b) of the Uniform Fraudulent Conveyance Act"). Under § 9(b), a creditor could have a fraudulent conveyance set aside or annulled, or the creditor could ignore the conveyance and levy execution on the property. *Brownell Realty, Inc.*, 103 Mich. App. at 698. The first alternative was an equitable remedy, while the second alternative was a legal remedy "based on the theory that the fraudulent transfer, though valid between the parties, is void as to the defrauded creditors." *Id.* In this case, plaintiff sought at trial the latter.

## Conclusion

Judgment will be rendered in favor of plaintiff and against defendants PCI and D&T as to Counts I and II.

Plaintiff is entitled to levy execution on the $54,196.69 of sale proceeds paid to PCI at the closing and on the $155,143.64 due to PCI from D&T.


Dated:  September 16, 2009                    /s/ Hugh W. Brenneman, Jr.
                                              HUGH W. BRENNEMAN, JR.
                                              United States Magistrate Judge